IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

M2M SOLUTIONS LLC,

     Plaintiff,

v.

SIERRA WIRELESS AMERICA, INC. and
SIERRA WIRELESS, INC.,

     Defendants.

Civil Action No. 12-30-RGA

M2M SOLUTIONS LLC,

     Plaintiff,

v.

CINTERION WIRELESS MODULES
GMBH and CINTERION WIRELESS
MODULES NAFTA LLC,

     Defendants.

Civil Action No. 12-31-RGA

M2M SOLUTIONS LLC,

     Plaintiff,

v.

ENFORA, INC., NOVATEL WIRELESS
SOLUTIONS, INC., and NOVATEL
WIRELESS, INC.,

     Defendants.

Civil Action No. 12-32-RGA

| | |
|---|---|
| M2M SOLUTIONS LLC,<br><br>       Plaintiff,<br><br>     v.<br><br>MOTOROLA SOLUTIONS, INC. TELIT<br>COMMUNICATIONS PLC, and TELIT<br>WIRELESS SOLUTIONS INC.,<br><br>       Defendants. | Civil Action No. 12-33-RGA |
| M2M SOLUTIONS LLC,<br><br>       Plaintiff,<br><br>     v.<br><br>SIMCOM WIRELESS SOLUTIONS CO.,<br>LTD., SIM TECHNOLOGY GROUP LTD.,<br>MICRON ELECTRONICS L.L.C., and<br>KOWATEC CORPORATION,<br><br>       Defendants. | Civil Action No. 12-34-RGA |

MEMORANDUM OPINION

Richard D. Kirk, Esq., BAYARD, P.A., Wilmington, DE; Marc N. Henschke, Esq. (argued), FOLEY & LARDNER LLP, Boston, MA.

    Attorneys for Plaintiff M2M Solutions LLC.

Thomas C. Grimm, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Christopher Mooney, Esq., NIXON PEABODY LLP, Palo Alto, CA.

    Attorneys for Defendants Sierra Wireless America, Inc. and Sierra Wireless, Inc.

Richard L. Horwitz, Esq., POTTER ANDERSON & CORROON LLP, Wilmington, DE; Brian A. Rosenthal, Esq. (argued), MAYER BROWN LLP, Washington, DC; Bryon T. Wasserman, Esq., MAYER BROWN LLP, Washington, DC.

Attorneys for Defendants Cinterion Wireless Modules GmbH and Cinterion Wireless Modules NAFTA LLC.

Francis DiGiovanni, Esq., NOVAK DRUCE CONNOLLY BOVE & QUIGG, Wilmington, DE; Michael J. Bettinger, Esq. (argued), K&L GATES LLP, San Francisco, CA.

Attorneys for Defendants Enfora, Inc., Novatel Wireless Solutions, Inc. and Novatel Wireless, Inc.

Jack B. Blumenfeld, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; David A. Loewenstein, Esq. (argued), PEARL COHEN ZEDEK LATZER, New York, NY.

Attorneys for Defendants Motorola Solutions, Inc., Telit Communications PLC, and Telit Wireless Solutions Inc.

George Pazuniak, Esq., O'KELLY ERNST & BIELLI, LLC, Wilmington, DE; Wenye Tan, Esq., Anova Law Group, PLLC, Sterling, VA.

Attorneys for Defendant Kowatec Corporation.

November 2, 2013

3

ANDREWS, U.S. DISTRICT JUDGE:

Pending before this Court is the issue of claim construction of various disputed terms found in U.S. Patent Nos. 8,094,010 ("'010 patent") and 7,583,197 ("'197 patent").[1]

## I. BACKGROUND

On January 1, 2012, M2M Solutions LLC ("Plaintiff") filed five patent infringement actions.[2] (Nos. 12-30, 12-31, 12-32, 12-33, and 12-34). The defendants are Sierra Wireless America, Inc., Sierra Wireless, Inc., Cinterion Wireless Modules GmbH, Cinterion Wireless Modules NAFTA LLC, Enfora, Inc., Novatel Wireless Solutions, Inc., Novatel Wireless, Inc., Motorola Solutions, Inc., Telit Communications PLC, Telit Wireless Solutions, Inc., Simcom Wireless Solutions Co., Sim Technology Group Ltd.,[3] and Kowatec Corporation (collectively, "Defendants"). The patents in suit are U.S. Patent Nos. 8,094,010 and 7,583,197. The Court has considered the parties' Joint Claim Construction Brief (D.I. 54), appendix (D.I. 55), Amended Joint Claim Construction Statement (D.I. 60), and oral argument on September 12, 2013. (D.I. 70).

## II. LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

---

[1] The patents have the same specification and several disputed claim terms appear in the asserted claims for both patents. Unless otherwise noted, the claim terms are construed consistently between both patents.

[2] All further citations are to the record in Civ. Act. No. 12-30.

[3] Simcom and Sim have not answered the Complaint, and did not participate in the *Markman* hearing.

(Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195 (D. Del. Sept. 4, 2013) (quoting *Phillips*, 415 F.3d at 1324). When construing patent claims, a matter of law, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotations and citations omitted).

Furthermore, "the words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314 (internal citations omitted).

A court may consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned

5

treatises," in order to assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art and how the invention works. *Id.* at 1317-19 (internal quotation marks and citations omitted). However, extrinsic evidence is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

Finally, "[a] claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (internal quotation marks and citation omitted).

## III. CONSTRUCTION OF DISPUTED TERMS

### A. U.S. Patent No. 8,094,010

1. *"permitted caller"*

a. Plaintiff's proposed construction: "A network-connected device from which the programmable communicator device is permitted to receive incoming transmissions for processing, and/or to which the programmable communicator device is permitted to send outgoing transmissions."

b. Defendants' proposed construction: "A telephone number or IP address on a list of numbers that are designated to cause the programmable communicator to ring or answer when an incoming call is received from that number."

6

c. Court's construction: "A telephone number or IP address on a list of numbers that are designated to cause the programmable communicator to accept an incoming call received from that number."

The Court agrees with Defendants that the plain and ordinary meaning of "caller" is the number that places an incoming call and not the number receiving the call. (D.I. 54 at 10). Absent evidence to the contrary, a claim term should be construed in accordance with its plain meaning. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) ("We indulge a 'heavy presumption' that claim terms carry their full ordinary and customary meaning unless the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution." (citations omitted) (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002))). Additional support for this construction can be found in Figures 2 and 3 of the '010 patent. Figure 2 depicts the action performed by the programmable communicator in response to an *incoming* call or message. In each scenario, the programmable communicator attempts to verify that the caller is on the "permitted callers list." By contrast, Figure 3 shows the action performed by the programmable communicator for an *outgoing* call or message. There is no mention of a "permitted caller." Instead, it displays the programmable communicator transmitting information to a "linked telephone or IP address."

Plaintiff relies on claim differentiation to support its overly broad construction. Claim differentiation, however, "is not a rigid rule but rather is one of several claim construction tools." *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1376 (Fed. Cir. 2009). This is especially true when the patentee seeks to use claim differentiation to expand the claim scope years after the

7

patent was originally filed–*i.e.*, a situation where the dependent claim that would be rendered

superfluous was added long after the original patent's filing date and shortly before the initiation

of litigation. *See id.* (rejecting claim differentiation argument advanced by patentee where

dependent claim "was only added to the [] patent in 2001, years after the filing date of the

original patents . . . and the introduction of the allegedly infringing Alaris products" ). Here,

dependent claims 7 and 8, which Plaintiff argues would be read out of the patent, were added

almost a decade after the original patent application first used the disputed term and just a few

months before the complaint in this case was filed. (D.I. 55-21 at M2M 0002030-2048; D.I. 55-

23 at M2M0001912). Thus, Plaintiff's claim differentiation argument is not persuasive here.

Where the Plaintiff's construction is too broad, Defendants' construction that would

require the programmable communicator to "ring or answer" is too narrow. This interpretation

would read the optional features of a described embodiment into the claims, and the Federal

Circuit has found this to be impermissible. *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d

1182, 1186 (Fed. Cir. 1998) ("[T]here is sometimes a fine line between reading a claim in light

of the specification, and reading a limitation into the claim from the specification."). Although

Defendants can point to embodiments that have features consistent with their proposed

limitation, other disclosed embodiments, including the remote monitoring of a vending machine,

are based on data messages that do not require the answering limitation. *See, e.g.*, '010 patent,

col. 3 ll. 43-52; col. 4 ll. 8-13. Therefore, this proposed limitation is too narrow.

2. *"coded number"*

a. Plaintiff's proposed construction: "A designated sequence of characters used

for purposes of attaining authentication or access."

8

   b. Defendants' proposed construction: "The 'unique identifier,' which is unique

to the programmable communicator, received by the programmable communicator from a

programming transmitter and is used to authenticate the at least one programming transmission."

   c. Court's construction: "A designated, unique sequence of characters."

   One object of the present invention is to provide an apparatus for processing coded

transmissions comprising a coded number, thereby determining the authenticity of the contained

message, prior to allowing the transmission through to the receiver device. *See* '010 patent, col.

4 ll. 35-40. The specification makes frequent reference to a PUK code, the unique code of the

Subscriber Identity Module (SIM card), as being used for purposes of authentication. *See, e.g.*,

'010 patent, col. 9 ll. 41-49; col. 9 ll. 61-67.

   Plaintiff contends that the coded number need not be unique, and that its selection of a

PUK code as a coded number was "by way of example only." '010 patent, col. 9 ll. 32-33.

However, the specification goes on to state that "any similar *unique* coding may be used for the

purpose of the invention." '010 patent, col. 9 ll. 33-34 (emphasis added). Although other coding

schemes may be used, the specification teaches that the code must be unique. Additionally,

Plaintiff's proposed inclusion of "used for purposes of attaining authentication or access" in its

claim construction is unnecessary and confusing because the claim language recites the purpose.

*See* '010 patent, claim 1 ("A programmable communicator device comprising: a processing

module *for authenticating an at least one transmission* . . . , the at least one transmission

including a coded number.") (emphasis added). Therefore, including this in the construction of

"coded number" would be redundant.

9

3. *"a programmable interface"*

    a. Plaintiff's proposed construction: "A hardware interface with associated management software that is able to be programmed and through which a programmable communicator device can establish a connection with a monitored technical device."

    b. Defendants' proposed construction: This is a means-plus-function limitation with the function of "establishing a communication link with at least one monitored technical device" and no corresponding structure, thereby rendering the claim indefinite. "The limitation is additionally indefinite because the term 'programmable' is insolubly ambiguous."

    c. Court's construction: "An interface that is able to be directly programmed."

The term "programmable interface" is presumptively not subject to § 112 ¶ 6 (now § 112(f)) because it does not contain the term "means." *See CCS Fitness,* 288 F.3d at 1369. The presumption "can be overcome if it is demonstrated that 'the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function.'" *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004) (quoting *CCS Fitness*, 288 F.3d at 1369). This presumption "is a strong one that is not readily overcome." *Id.* Even though a term might not bring a particular structure to mind, that is not dispositive and the court can look to the dictionary to see if the term is one that is "understood to describe structure, as opposed to a term that is simply a nonce word or a verbal construct that is not recognized as the name of structure and is simply a substitute for the term 'means for.'" *Id.* at 1360; *Mass. Inst. of Tech. & Elecs. for Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006) ("*MIT*").

In *MIT*, the Federal Circuit found that the term "colorant selection mechanism" is subject

10

to § 112 ¶ 6.  *See MIT*, 462 F.3d at 1354 (noting that patentee used "mechanism" and "means" as

synonyms and that "[a]t least one dictionary definition equates mechanism with means").

Moreover, "colorant selection" was not defined in the specification, did not have a dictionary

definition, and there was no showing that "colorant selection mechanism" would "connote

sufficient structure" to one of ordinary skill in the art.  *Id.*  By contrast, "detent mechanism" is

not subject to § 112 ¶ 6 because "the noun 'detent' denotes a type of device with a generally

understood meaning in the mechanical arts, even though the definitions are expressed in

functional terms."  *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir.

1996).

Here, there is a strong presumption against applying § 112 ¶ 6 to "programmable

interface" because the word "means" is not used in the claim language.  Unlike in *MIT*, the

presumption cannot be overcome because "programmable interface" connotes sufficient structure

to one of skill in the art, and both component terms have well understood definitions.  The

Federal Circuit has previously construed "interface" as "[t]he signal connection and associated

control circuits that are used to connect devices."  *Apex, Inc. v. Raritan Computer, Inc.*, 325 F.3d

1364, 1374 (Fed. Cir. 2003).  "Programmable" is generally understood in the art to mean

"[c]apable of accepting instructions for performing a task or an operation."  MICROSOFT

COMPUTER DICTIONARY 360 (4th ed. 1999).  The Defendants fail to overcome the presumption

that "programmable interface" is not a means-plus-function.  Accordingly, § 112 ¶ 6 does not

apply.

Although the Court rejects the Defendants' proposed construction, the Court also rejects

the Plaintiff's proposal.  The Court sees no reason to include "associated management software"

11

in the definition, or to make reference to the programmable communicator device or the monitored technical device. Instead, a more helpful construction, and one the Court believes is truer to the term's language and the intrinsic record, is the one the Court adopts, namely, "an interface that is able to be directly programmed."

4. *"processing module"*

a. Plaintiff's proposed construction: "A processor with executable program code for authenticating an at least one transmission received from a programming transmitter including an at least one telephone number or IP address corresponding to an at least one monitoring device by determining whether the at least one transmission includes a coded number."

b. Defendants' proposed construction: This is a means-plus-function limitation with the function of "authenticating an at least one transmission sent from a programming transmitter and received by the programmable communicator device, the at least one transmission including a coded number and at least one telephone number or Internet Protocol (IP) address corresponding to an at least one monitoring device, wherein the processing module authenticates the at least one transmission by determining if the at least one transmission contains the coded number, the processing module authenticating the at least one transmission if the transmission includes the coded number." There is no corresponding structure, so the limitation is indefinite.

c. Court's construction: "Components or units of a computer program."

The Court applies the same analysis detailed in Section III.A.3, *supra*, to determine that § 112 ¶ 6 does not apply to "processing module." "Means" language is not used in the claim itself,

12

and several district courts have construed "module" as connoting sufficient structure to avoid the application of § 112 ¶ 6. *See, e.g., Stanacard LLC v. Rebtel Networks, AB*, 680 F. Supp. 2d 483, 498-99 (S.D.N.Y. 2010); *Beneficial Innovations, Inc. v. Blockdot, Inc.*, 2010 WL 1441779, at *16 (E.D. Tex. Apr. 12, 2010); *C2 Commc'ns Techs., Inc. v. AT&T, Inc.*, 2008 WL 2462951, at *11 (E.D. Tex. June 13, 2008). The Defendants counter by citing an opinion finding that "distributed learning control module" was subject to § 112 ¶ 6. *Williamson v. Citrix Online LLC*, 2012 WL 2523827, at *24 (C.D. Cal. Sept. 4, 2012) ("The term 'module,' as used in the disputed terms, does not connote sufficient structure to avoid a means-plus-function construction under § 112 ¶ 6."). While the Court recognizes the split in the district courts over the construction of "module," the Court agrees with the Plaintiff, and the weight of authority in its favor, in finding that § 112 ¶ 6 does not apply in this case to the term.

Indeed, the construction in *Beneficial Innovations* is especially instructive because the defendants there raised similar arguments to the Defendants in this case, and the disputed claim terms were nearly identical. *See Beneficial Innovations*, 2010 WL 1441779, at *16 ("Defendants argue that the phrase 'user response processing modules' does not recite sufficiently definite structure, does not appear anywhere in the specification of the '366 patent, and does not have a generally understood meaning to a person of ordinary skill in the art."). The court rejected these arguments and construed "user response processing modules" to mean "components or units of a computer program . . . ." *Id.* (supporting its conclusion with decisions from other courts and fact that patentee provided definitions for both "processing" and "module"). The Court sees no justification for straying from the well-reasoned conclusion offered by the court in *Beneficial Innovations.*

13

5. *"monitoring device"*

a. Plaintiff's proposed construction: "A network-connected device configured to remotely monitor a programmable communicator device and/or a monitored technical device."

b. Defendants' proposed construction: "A device configured to remotely monitor a programmable communicator device and/or a monitored technical device."

c. Court's construction: "A device configured to remotely monitor a programmable communicator device and/or a monitored technical device."

Both parties agree that "monitoring device" should be construed to mean "a device configured to remotely monitor a programmable communicator device and/or a monitored technical device"–the sole dispute is whether, as Plaintiff contends, there should be a further limitation that the monitoring device must be "network-connected." (D.I. 54 at 56, 59). Independent claims 1, 52, 104, and 151 of the '010 patent each recite a telephone number or IP address corresponding to the monitoring device. Plaintiff argues that because the monitoring device is remote, it must be network-connected in order to receive transmissions from the programmable communicator and to perform its monitoring duties. (D.I. 54 at 56-57 ("Indeed, were the 'monitoring device' *not* connected to the network, it would be unable to communicate with the programmable communicator . . . .")). However, the specification recognizes that a number or IP address might not always be available and discloses a procedure for what happens when the programmable communicator "detects that the telephone number is engaged or does not answer or that the IP address is invalid." '010 patent, col. 5 ll. 38-45; col. 9 ll. 1-4 ("In the case that the programmable communicator is unable to make an immediate connection with the linked telephone number or IP address, a reselection means 150 provides one or more connection

14

numbers from the permitted callers list."). This belies Plaintiff's argument, and the Court agrees with Defendants that there is no basis for importing the "network-connected" limitation into the meaning of "monitoring device."

      6. *"wireless communications circuit for communicating through an antenna"*

          a. Plaintiff's proposed construction: "Circuitry that enables the sending and receiving of wireless transmissions through an antenna."

          b. Defendants' proposed construction: "A complete circuit that transmits and receives data and includes at least an antenna, transmitter, receiver, power supply, a ringing tone generator and an auto answer module."

          c. Court's construction: "A complete wireless circuit that transmits and receives data and includes an antenna."

The term "circuit" encompasses both "open" and "closed" circuits. However, only a closed or complete circuit will provide the functionality disclosed in the specification–*i.e.*, in order for the circuit to perform its wireless communication function, there must be a "path for the flow of current." *Compare* THE FREE DICTIONARY, http://www.thefreedictionary.com/closed+circuit (last visited Sept. 17, 2013) (defining "closed circuit" as "[a]n electric circuit through which current can flow in an uninterrupted path"), *with* THE FREE DICTIONARY, http://www.thefreedictionary.com/open+circuit (last visited Sept. 17, 2013) (defining "open circuit" as "an incomplete electrical circuit in which no current flows").[4] Although there is no language in the specification explicitly limiting the invention to a closed

---

    [4] The Defendants provided a citation to this online dictionary in support of their argument. The Plaintiff does not assert, nor is there any evidence to suggest, that the definition of "closed circuit" or "open circuit" has changed since the time of the invention.

circuit, the claims and the embodiments described in the specification would not be possible if no current flowed through the circuit. Therefore, the Court construes the "wireless communications circuit" as being a complete circuit.

The Defendants' proposed inclusion of limitations addressing a "transmitter, receiver, power supply, a ringing tone generator and an auto answer module" is inappropriate based on the claims and specification. Unlike "antenna," none of these proposed limitations can be found in the claim language. *See* '010 patent, claim 1 ("A programmable communicator device comprising: a wireless communications circuit for communicating through an antenna . . . ."). The Abstract provides further support for including the "antenna" limitation because it refers to a wireless circuit "including an antenna." '010 patent, Abstract. The other elements cannot be found in the claim language at all. The Summary of the Invention section states that the "programmable communicator preferably comprises a basic mobile telephone circuit . . . and a rechargeable battery and antenna and a basic two-way microphone device . . . ." '010 patent, col. 7 ll. 31-34. Absent something more, this mention is insufficient to impute these limitations into the claim's construction. *Kinik Co. v. Int'l Trade Comm'n*, 362 F.3d 1359, 1364 (Fed. Cir. 2004) ("[W]hen the specification describes the invention in broad terms, accompanied by specific examples or embodiments, the claims are generally not restricted to the specific examples or the preferred embodiments unless that scope was limited during prosecution."). Similarly, the only discussion of a "ringing tone generator" or "auto answer" module relates to a few of the described embodiments. *See, e.g.*, '010 patent, col. 6 l. 65-col. 7 l. 8; col. 8 ll. 31-41. But numerous other embodiments are included in the specification, and thus it would be improper to read the limitations from some embodiments into the claim language. *See Kinik Co.*, 362 F.3d at

1364.

7. *"monitored technical device"*[5]

      a. Plaintiff's proposed construction: "A technical device that is locally connected with the programmable interface of a programmable communicator device so as to be monitored by the programmable communicator device and/or by a monitoring device."

      b. Defendants' proposed construction: "A device that provides status information to the remote monitoring device through the communicator."

      c. Court's construction: "A device that provides information to the remote monitoring device through the programmable communicator device."

The specification is replete with references in various embodiments to both "data" and "status" information that is transmitted by the monitored technical device. *Compare* '010 patent, col. 3 ll. 43-46 ("[T]here exists the need for a [device] which can be used to relay information about the status of a remote piece of technical equipment . . . ."), *with* '010 patent, col. 5 ll. 46-50 ("It is a further object of the present invention to provide a [device] which is able to store a sound byte or store a data record and send the sound byte or data record to any other telephone number or IP address . . . ."). Similarly, Figure 3 depicts the collection and transmission of data as well as the collection and transmission of a status condition. There is no indication that one is preferred over the other. Either can be used depending on the embodiment being practiced. '010 patent, col. 11 ll. 6-9 ("The types of data the communicator can provide periodically, or on request, are determined directly by the application of the invention . . . ."). "Status information"

---

[5] The parties agree that "monitored technical device" as used in the '010 patent is equivalent to "interfaced device" in the '197 patent. (D.I. 54 at 48, 52).

17

is a subset of the overall "data" that could be sent, and it would be improper to limit the

monitored technical device to a device that only provides "status information," as Defendants

suggest.

**B. U.S. Patent No. 7,583,197**

1. *"at least one wired or wirelessly attached monitoring device"*

a. Plaintiff's proposed construction: "A programmable interface having a wired

or wireless connection with a monitoring device."

b. Defendants' proposed construction: The claim is indefinite, but to the extent

that it is construed, it should mean "a device local to the programmable communicator that

monitors the status of another device and is connected to the personal communicator by wire or

wirelessly."

c. Court's construction: The claim is indefinite.

As used in the independent claims of the '197 patent,[6] the claim term "at least one wired

or wirelessly attached monitoring device" is indefinite because it is "not amenable to

construction." *Datamize LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005)

("Only claims 'not amenable to construction' or 'insolubly ambiguous' are indefinite."). As

discussed in Section III.A.5, *supra*, a "monitoring device" is construed to mean, "A device

configured to remotely monitor a programmable communicator device and/or a monitored

technical device." The parties do not dispute the "remote" nature of the monitoring device.

Consistent with the understanding that the monitoring device is remote, claim 107 of the '197

patent refers to "at least one telephone number or IP address corresponding to *the* at least one

_____

[6] At issue are independent claims 1, 29, 40, 68, 79, and 107 of the '197 patent.

18

monitoring device." '197 patent, claim 107 (emphasis added). The word "the" in this claim term, however, indicates the presence of an antecedent basis and points the Court to "a programmable interface *connected to* at least one wired or wirelessly *attached* monitoring device," recited earlier in the claim. *Id.* (emphasis added). Using the words "connected to" and "attached" to describe the link between the monitoring device and the programmable interface suggests that the monitoring device is local, not remote, in this passage of the claim.

Plaintiff appears to have conceded that "attached," in the context of a different disputed claim term, means local. In its brief, Plaintiff states: "Defendants acknowledge that a 'monitored technical device' is 'attached to' and 'interfaced directly with' a programmable communicator's 'programmable interface,' so the fact that a local connection is formed cannot reasonably be disputed." (D.I. 54 at 55). The monitoring device, however, cannot be both local and remote at the same time, or the purpose of the programmable communicator device in the '010 and '197 patents, as described by the Plaintiff, would be rendered a nullity. (*Id.* at 3) (recognizing that "[t]he claimed programmable communicator has an interface for locally connecting to and receiving data from a 'monitored technical device' (e.g., a vending machine), and it can process and selectively relay that data over a 'communications network' (e.g., a cellular telephone network) to a remote 'monitoring device'" which "can remotely program the programmable communicator . . . ." This error was fixed in the '010 patent, which claims a "programmable interface for establishing a communication link with at least one *monitored technical device*" and "at least one telephone number or Internet Protocol (IP) address corresponding to an at least one monitoring device." '010 patent, claim 1 (emphasis added). Under this construction, there is a local "monitored technical device" being monitored by a remote "monitoring device." It cannot

19

be, as would be the case under the '197 patent, that a local "attached monitoring device" is being monitored by the same remote "monitoring device." Therefore, because the term "at least one wired or wirelessly attached monitoring device" in the '197 patent is "not amenable to construction," the asserted claims containing that language are indefinite. *See Datamize LLC*, 417 F.3d at 1347.

2. *"a wireless communications circuit having an antenna"*

a. Plaintiff's proposed construction: "Circuitry coupled with an antenna that enables the sending and receiving of wireless transmissions."

b. Defendants' proposed construction: "A complete circuit that transmits and receives data and includes at least an antenna, transmitter, receiver, power supply, a ringing tone generator and an auto answer module."

c. Court's construction: "A complete wireless circuit that transmits and receives data and includes at least an antenna."

The Court has construed "a wireless communications circuit having an antenna" in the '197 patent identically to a "wireless communications circuit for communicating through an antenna" in the '010 patent. The analysis from section III.A.6, *supra*, is incorporated by reference.

## IV. CONCLUSION

Within five days the parties shall submit a proposed order consistent with this Memorandum Opinion suitable for submission to the jury.

20